# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

UP TO $371,077.57 IN FUNDS ON DEPOSIT
IN U.S. BANK ACCOUNT ENDING IN #6229
HELD IN THE NAME OF QICBID LLC

Case Number: 18-M-5

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Jill Dring, being duly sworn depose and say:

I am a Special Agent with the Federal Bureau of Investigation, and have reason to believe that in the Eastern District of Wisconsin there is now certain property, namely, up to $371,077.57 in funds on deposit in U.S. Bank account ending in #6229 held in the name of Qicbid LLC that is civilly forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984, including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and criminally forfeitable under 18 U.S.C. § 981(a)(1)(C) in conjunction with 28 U.S.C. § 2461(c), as property that is derived from proceeds traceable to specified unlawful activity, namely, wire fraud in violation of 18 U.S.C. § 1343, and which property is therefore also subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b)(2) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

The application is based on these facts:

✓ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Sworn to before me, and subscribed in my presence

Signature of Affiant
Jill Dring, FBI

Feb 2, 2018 11:03 a.m.
Date and time issued

at Milwaukee, Wisconsin
City and State

David E. Jones, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT

I, Jill Dring, having been first duly sworn on oath, state that:

## Affiant's Background

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since March 2013. I am currently assigned to the Milwaukee office and investigate white-collar crimes, including mail and wire fraud offenses.

2. Because I am submitting this affidavit for the limited purpose of establishing probable cause for the requested seizure warrant, I have not included in this affidavit every detail I know about this investigation. Rather, I have included only the information necessary to establish probable cause for the requested seizure warrant.

3. The facts set forth in this affidavit are based on my personal knowledge, my review of records received from U.S. Bank, and information I have obtained in the course of this investigation from citizen witnesses and employees of Newtek Small Businesses Finance LLC, all of whom I believe to be truthful and reliable.

## Property Sought to be Seized

4. I submit this affidavit in support of an application for a warrant to seize up to $371,077 in funds on deposit in U.S. Bank account ending in #6229 ("U.S. Bank #6229") held in the name of "Qicbid LLC." The sole signatory for U.S. Bank #6229 is Nicholas Schaetzel.

5. For the reasons set forth below, I submit that up to $371,077 in funds on deposit in U.S. Bank #6229 are:

   a. Funds traceable to, and are therefore proceeds of, a wire fraud offense or offenses committed in violation of 18 U.S.C. § 1343;

   b. Subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(C) and 984, including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1);

   c. Subject to criminal forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); and

   d. Subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b)(2) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

   e.

## Facts Supporting Findings of Probable Cause for Issuance of Seizure Warrant

6. Based on the facts set forth below, I submit that there exists probable cause to believe that Nicholas Schaetzel and an auction company he owned and operated knowingly

devised and executed a scheme to defraud one of the auction company's clients. As a part of that scheme to defraud, Schaetzel knowingly made false statements of material fact to that client, with intent to defraud the client. For the purpose of carrying out the scheme, Schaetzel also caused interstate wire communications.

7. Specifically, following his auction company's conduct of an auction of items belonging to the client, Schaetzel sent lulling email messages to the client. Those emails advised the client that Schaetzel intended to promptly pay the client the full amount of auction proceeds that Schaetzel and his auction company owed the client. But, in fact, when Schaetzel sent those email messages to the client, he intended to convert some or all the money he owed the client to his own use and to the use of his auction company. The lulling emails furthered the fraud scheme in that they lulled the client into refraining from taking prompt action to recover the amounts that Schaetzel and his auction company owed the client and they thereby afforded Schaetzel additional time to convert the funds.

8. On March 7, 2017, Qicbid LLC, an auction company owned and operated by Nicholas Schaetzel, entered into a contract with Newtek Small Business Finance LLC ("Newtek") for the purposes of conducting an online auction of certain trucks, vans, flatbed trailers, and related equipment ("the Contract"). The auction was posted on Qicbid's website as "Olson's Trucking No Reserve Online Auction." According to the Contract, Qicbid was based in Theresa, Wisconsin. Newtek is headquartered in New York City, New York.

9. According to the terms of the Contract, Qicbid agreed: to sell the equipment for Newtek, to receive payment for the sale of the items, and to pay Newtek within 30 days of the completion of the auction. Newtek, in turn, agreed to pay Qicbid a 15% commission on the gross sales for Qicbid's services. In addition, the Contract provided that Qicbid was entitled to collect and retain an 18% Buyer's Fee from all buyers, and the Buyer's Fee was not to be included in the gross sales. Paragraph 5 of the Contract specifically required Qicbid to retain the portion of the sales proceeds due Newtek:

> All monies received shall be received and retained by QB to be applied as follows: First to cover the Buyer's Fees; Then to cover the Sales Commission on the Sale's gross; and, then expenses documented and approved. Thereafter, all remaining monies will be paid to Consigner, within 30 business days following completion of the Sale. QB shall furnish Consigner with a final accounting of the all [sic] proceeds actually received from the Sale of Consigner's items [Schedule A], which shall include a list of all such assets sold per item and the final sales price.

10. The auction began on May 23, 2017, and closed on June 15, 2017. During that time, Qicbid sold all but two of the items it had listed for auction for Newtek. The two remaining items were a 1991 Peterbilt 379 Truck Trailer and a 2007 Wabash cube trailer. Following the auction, on July 21, 2017, Truck World, Inc. ("Truck World") purchased the 1991 Peterbilt 379 Truck Trailer, and paid the proceeds of the sale to Qicbid by check.

11. To date, Qicbid has not paid Newtek any of the money to which Qicbid agreed to pay Newtek under the Contract for the sale of Newtek's equipment.

2

## Analysis of records for U.S. Bank #6229

12. I reviewed the records for U.S. Bank #6229, which is the business account for Qicbid. The account was opened on March 7, 2016, in the name of Qicbid LLC, with an address of 657 Clare Lane, Hartford, Wisconsin, which is the address that appears on checks written in 2017. Since opening U.S. Bank #6229, the mailing address for monthly bank statements has been changed and, at the time of the auction, was listed as 119 Depot Road, Theresa, Wisconsin.

13. Before the start of the auction that Qicbid agreed to conduct for Newtek, Qicbid had less than $25 in U.S. Bank #6229. Specifically, on May 31, 2017, U.S. Bank #6229 had an end-of-month balance of $24.02. Thereafter, overdraft fees were charged to U.S. Bank #6229 on June 5, 2017; June 9, 2017; and June 12, 2017. But on June 30, 2017, after Qicbid had conducted the auction for Newtek, the end of the month balance for U.S. Bank #6229 was $543,073.50.

14. On June 16, 2017, U.S. Bank #6229 began receiving proceeds from Qicbid's auction of items for Newtek. On that date, U.S. Bank #6229 received the first deposits from the sale of the items it auctioned for Newtek, which were wire transfers from Peterson Motors Company in the amount of $45,425 and from Truck World in the amount of $242,500.

15. On June 19, 2017, eight additional checks, totaling $138,575, from the following customers who had purchased items during Qicbid's auction for Newtek, were deposited into U.S. Bank #6229:

|    | Amount Paid | Customer |
|----|-------------|----------|
| 1. | $4,830.00 | R.F. for a 2000 Raven Trailer |
| 2. | $8337.50 | D.S. |
| 3. | $14,662.50 | Lauer Farms, Inc. for a 2007 Fontaine drop deck trailer |
| 4. | $5,175.00 | R.B. |
| 5. | $41,400.00 | K.D. |
| 6. | $11,960.00 | J.P. |
| 7. | $32,775.00 | A.A. |
| 8. | $19,435.00 | Thompson Machinery Moving |
|    | **$138,575.00** | **TOTAL** |

16. On June 20, 2017, two additional checks, totaling $16,617.50, from the following customers who had purchased items during Qicbid's auction for Newtek, were deposited into U.S. Bank #6229:

3

|   | Amount Paid | Customer |
|---|---|---|
| 1. | $14,662.50 | K.A. for two 2000 Benson Trailers |
| 2. | $1,955.00 | Runde Metal |
|   | **$16,617.50** | **TOTAL** |

17. On June 21, 2017, one check, in the amount of $44,275, from customer C. Kuehn Trucking, Inc. for the purchase of lots 36 and 47 during Qicbid's auction for Newtek, was deposited into U.S. Bank #6229.

18. On June 23, 2017, three checks, totaling $39,000, from the following customers who had purchased items during Qicbid's auction for Newtek, were deposited into U.S. Bank #6229:

|   | Amount Paid | Customer |
|---|---|---|
| 1. | $20,945.00 | Tampa Trucking Group Inc, for lots 31 and 39 |
| 2. | $8,625.00 | M.S. |
| 3. | $9,430.00 | A.J. and J.J. |
|   | **$39,000.00** | **TOTAL** |

19. On July 21, 2017, one check in the amount of $6,000, from customer Truck World, for the purchase of an item during Qicbid's auction for Newtek, was deposited into U.S. Bank #6229.

20. Thus, between June 19, 2017, and July 21, 2017, U.S. Bank #6229 received, as proceeds from the sale of Newtek's items during Qicbid's auction, and via wire transfers and deposited checks, a total of $532,392.50.

**Interviews and other evidence**

21. On December 15, 2017, I interviewed an individual with the initials M.F., who works for Truck World. M.F. confirmed that Truck World had purchased several items from the Olson Trucking auction hosted by Qicbid and for which Truck World had paid Qicbid $242,500 by wire transfer on June 16, 2017 (referenced in paragraph 14), for the following items:

| Lot # | Item |
|---|---|
| 3 | 2001 Kenworth W900L |
| 8 | 1999 Freightliner FLD132 |
| 9 | 2001 Freightliner Columbia 120 |
| 10 | 2000 Peterbilt 379 Truck |
| 11 | 1994 Peterbilt 379 Truck Tractor |
| 15 | 1996 Peterbilt 379 Truck Tractor |
| 16 | 2000 Ravens 12501183 Flatbed Trailer |
| 17 | 2014 Fontaine LX140 Renegade Detach |

4

| 23 | 2003 Chaparral Drop Deck Trailer |
| 25 | 1997 Kenworth W900L Truck Trailer |
| 26 | 2003 Freightliner Century ST112 |
| 27 | 2003 Peterbilt 379 Truck Tractor |
| 33 | 2007 Chaparral Flatbed Trailer |
| 35 | 2005 Peterbilt 357 Dump Truck |
| 44 | 2007 Sterling L9500 Dump Truck |
| 46 | 1996 Peterbilt 379 Truck Tractor |

22. M.F. also confirmed that on July 21, 2017, Truck World paid $6,000 by check for a 1991 Peterbilt Truck Trailer, lot #4, which Truck World had purchased via the auction hosted by Qicbid, as referenced in paragraph 19. M.F. stated that Truck World had received all of the above items.

23. On December 15, 2017, I interviewed an individual with the initials J.F., who is the brother of R.F. R.F.'s name appears on a deposited check in the amount of $4,830 made payable to Qicbid, as identified in paragraph 15. According to J.F., R.F. had received the 2000 Raven trailer in the online auction from Qicbid.

24. On December 15, 2017, I interviewed an individual with the initials M.S., who works for Thompson Machinery Moving. M.S. confirmed that Thompson Machinery Moving had purchased two items sold in the Olson Truck auction hosted by Qicbid – namely, lot #38, a 1993 Transcraft Flatbed Trailer, and lot #37, a 2005 Peterbilt 379 Truck Tractor. This purchase totaling $19,435 is referenced in paragraph 15.

25. On December 15, 2017, I interviewed an individual with the initials B.J., who works for C. Kuehn Trucking. B.J. confirmed that C. Kuehn Trucking had purchased lot #36, a 2004 SpecTec Open Top Refuse Trailer, and lot #47, a 2005 Manac Walking Floor Trailer, through the online auction hosted by Qicbid. This purchase is referenced in paragraph 17.

26. On December 15, 2017, I interviewed an individual with the initials M.R., who is the owner of Runde Metal. M.R. confirmed that he had purchased lot #43, a Wasbash Duraplate Dry Van Trailer, from the online auction hosted by Qicbid. M.R. said that he had paid $1,955 for the trailer and that he had received the trailer from Qicbid. This purchase is referenced in paragraph 16.

**Statements made by Nicholas Schaetzel, the owner of Qicbid**

27. According to the Qicbid website, bidding on Olson's Trucking auction for Newtek ended on June 15, 2017. According to the terms of the Contract, Qicbid was obligated to retain the portion of the sales proceeds due Newtek and then to pay those proceeds due Newtek within 30 business days of the completion of the auction sale.

28. On July 7, 2017, G.P., who is the Vice President of Asset Management for Newtek, sent an email to Nicholas Schaetzel requesting a status update on the auction results and

5

an issuance of the auction proceeds. On July 10, 2017, Schaetzel replied to G.P.'s email stating that "Cheryl" was working on it. "Cheryl" is believed to be an individual with the initials C.K., whom Schaetzel had listed as his Administrative Assistant.

29. On July 14, 2017, G.P. sent Schaetzel two emails. In one email, G.P. asked Schaetzel about the status of finalizing the auction results and the issuance of the auction proceeds. In a second email, G.P. asked Schaetzel about the processing of the titles for the trucks. Schaetzel replied via email that they still had one customer to collect payment from and that they were still in process regarding the titles.

30. On July 19, 2017, G.P. asked Schaetzel via email if the Peterbilt truck trailer was still on the auction site. Schaetzel confirmed that it was still on the auction site along with the Wabash cube trailer.

31. On July 20, 2017, G.P. sent an email to Schaetzel asking if $2,700 was the best offer for the 2007 Wabash trailer. Schaetzel replied that he would check with "him."

32. On July 24, 2017, G.P. emailed Schaetzel and asked for the projected time of remittance. On July 25, 2017, Schaetzel replied via email stating that "Cheryl" had been off and he would check with her once she returned.

33. On August 11, 2017, Schaetzel wrote to G.P. stating: "Cheryl has been working on the settlement and the title issues. As soon as I get in contact with her I will give you an update as to when the settlement and proceeds will be sent off."

34. G.P. sent emails to Schaetzel on August 14, 2017; August 17, 2017; and August 18, 2017, but Schaetzel never responded to any of those emails. G.P. did receive a "read receipt" for G.P.'s August 18, 2017 email to Schaetzel but G.P. never received a response from Schaetzel.

35. In addition to email correspondence, G.P. attempted several phone calls to Schaetzel and kept a log of those attempts. Schaetzel never responded to any of G.P.'s messages, which included the following:

    a. On August 14, 2017, G.P. sent an email to Schaetzel stating that she had left a message on both his cell phone and office phone voice mail systems.

    b. On August 25, 2017, G.P. sent an email to Schaetzel requesting that he attend to her concerns as soon as possible. G.P. also stated that they were still waiting for the auction reports and accounting, which Schaetzel had promised for that day.

    c. On August 28, 29 and 30, 2017, G.P. sent emails to Schaetzel stating that she had left messages on his business line and attempted to reach him via his cell phone, which was no longer accepting messages.

6

36. On September 15, 2017, a legal representative acting on behalf of Newtek sent a certified letter to seven addresses associated with Nicholas Schaetzel. All of the letters were returned with the exception of the letter sent to 119 Depot Road, Theresa, Wisconsin, which was signed for by "M. Schaetzel." Nicholas Schaetzel did not respond to that letter, or to any messages from Newtek after August 11, 2017.

37. To date, Newtek has received none of the auction proceeds that Qicbid and Schaetzel were obligated to pay Newtek under the Contract.

**Schaetzel's August 11, 2017 post-auction lulling email message to Newtek, sent before and after he had spent auction proceeds belonging to Newtek and that Qicbid was obligated to retain to repay Newtek**

38. As noted above, between June 19, 2017, and July 21, 2017, Schaetzel received $532,392.50 in total gross proceeds from Qicbid's auction of Newtek's items. Schaetzel received all those proceeds in the U.S. Bank #6229, an account that he solely controlled. Under the Contract, Qicbid was obligated to pay Newtek approximately $371,077.57 within 30 days of the completion of the auction, and Qicbid was entitled to retain approximately $161,314.93.

39. Specifically, under paragraph 4 of the Contract, Qicbid was entitled to collect and retain an 18% Buyer's Fee from all Buyers, and the Buyer's Fee was not to be included in the calculation of gross sales. Under paragraph 5 of the Contract, Newtek agreed to pay Qicbid a sales commission of 15% of the gross sales amount, excluding the Buyer's Fee. After subtracting the 18% Buyer's Fee ($95,830.65) and the 15% commission ($65,484.28) from the $532,392.50 in deposits, the amount due to Newtek under the Contract is $371,077.57, and the amount Qicbid was entitled to retain was approximately $161,314.93.

40. But after Schaetzel and Qicbid received the $532,392.50 in total gross auction proceeds from Qicbid's auction of Newtek's items, Schaetzel engaged in a scheme to defraud Newtek. As a part of that scheme, Schaetzel made false statements of material fact for the purpose of defrauding Newtek and lulling Newtek into believing that Schaetzel would pay Newtek the full amount that Qicbid and Schaetzel owed Newtek under the Contract.

41. Specifically, Schaetzel sent Newtek emails indicating that he and Qicbid would soon be paying Newtek the amount Newtek was owed when, in fact, Schaetzel was not in a position to make that full payment. That was because, at the time he had sent those messages, Schaetzel and Newtek had already expended sums from the U.S. Bank #6229 account that exceeded the $161,314.93 in combined Buyer's Fee and commissions that Qicbid was entitled to retain from the auction proceeds. Because substantially all the money in that bank account, at that time, consisted of the auction proceeds from the auction Qicbid had conducted for Newtek, by spending more than he and his company were entitled to retain under the Contract, Schaetzel had expended a material amount of the $371,077.57 that he and Qicbid owed Newtek under the Contract.

7

42. For example, in response to G.P.'s August 11, 2017 email message, Schaetzel advised G.P. by email of that same date: "Cheryl has been working on the settlement and the title issues. As soon as I get in contact with her I will give you an update as to when the settlement and proceeds will be sent off."

43. But he was in no position to make full payment because bank records showed, by August 11, 2017, Schaetzel had already expended $179,500 from the U.S. Bank #6229 account. Bank records show that two checks were written from U.S. Bank #6229 to C.K. ("Cheryl") – one on June 23, 2017, in the amount of $4,000, and the other on July 27, 2017, in the amount of $500. On July 24, 2017, a wire debit was made from U.S. Bank #6229 to King Kullen Grocery in the amount of $175,000. Because substantially all the funds in the account then consisted of proceeds of Qicbid's auction of Newtek's items, after Schaetzel made those expenditures, he could no longer pay the full amount of settlement proceeds Qicbid then owed Newtek – contrary to Schaetzel's indication in his August 11 message that Qicbid could and would soon do so.

44. Schaetzel's subsequent conversion of additional auction proceeds owed Newtek strongly indicate that, as of August 11, Schaetzel did not intend to make full payment to Newtek.

45. On November 13, 2017, a check from U.S. Bank #6229 was issued to Schaetzel in the amount of $30,000.

46. On November 17, 2017, a check was written from U.S. Bank #6229 to King Kullen Grocery in the amount of $50,000.

47. On November 20, 2017, Schaetzel made a counter withdrawal from U.S. Bank #6229 in the amount of $30,000.

48. Those November 13, 2017, and 20 expenditures were all funded by proceeds of the auction of Newtek's items owed to Newtek, as no significant outside funds had been deposited into the U.S. Bank #6229 account between July 24, 2017, and November 20, 2017.

49. To date, Schaetzel has paid no money to Newtek for the proceeds of the auction that Qicbid hosted to sell Newtek's equipment.

50. As of today, U.S. Bank #6229 has an available balance of only approximately $155,725.93.

51. Based on the foregoing facts, I submit that there exists probable cause to believe that Schaetzel devised and executed a scheme to defraud Newtek involving the use of interstate wirings.

52. I submit that Schaetzel executed that scheme by, among other things, sending email messages to Newtek in which Schaetzel falsely stated, and falsely implied, with intent to defraud Newtek, that Qicbid had retained the auction proceeds due Newtek and that Schaetzel would cause Qicbid to promptly pay those proceeds to Newtek.

8

53. In fact, when Schaetzel sent those email messages – and particularly, his August 11 email to G.P. of Newtek – Schaetzel well knew that Qicbid could no longer pay in full what Qicbid owed Newtek because Schaetzel had by then already begun spending the portion of the auction sales proceeds due Newtek. Schaetzel also knew that he lacked additional funds in the account that he could use to pay Newtek the full amount Qicbid owed Newtek.

54. I further submit that there exists probable cause to believe that, at least as when he sent his August 11 email message to Newtek, and in view of his pattern of subsequent behavior, Schaetzel did not intend to pay Newtek any substantial portion of the sales proceeds.

55. Indeed, after he sent his August 11 email message to Newtek that stated, or at least plainly implied, that Qicbid had retained and would soon pay Newtek, Schaetzel instead: (a) stopped responding to Newtek inquiries; (b); spent $110,000 of funds owed Newtek during November 2017; (c) apparently expended or transferred nearly another $100,000 owed Newtek since then, given that the current balance U.S. Bank #6229 is only $155,725.93 – an account balance fully $215,351.64 less than the $371,077.57 amount Qicbid was required to retain and to pay to Newtek; and (d) to date, Schaetzel has not caused Qicbid to pay Newtek even a dime of the auction proceeds.

56. Schaetzel's false statement in his August 11 email to G.P. of Newtek – to the effect that he would soon give "an update as to when the settlement and proceeds will be sent off" – was material in that it could have had the effect on Newtek, and apparently did have the effect, of lulling Newtek into refraining, for months, from taking affirmative steps to recover the auction proceeds due to Newtek from accounts controlled by Qicbid, Schaetzel, or both.

## Applicable Asset Forfeiture Provisions

57. Title 18, United States Code, Section 981 subjects to civil forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation" of, among other offenses, the mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343. 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7), and 1961(1). Section 981, in conjunction with 28 U.S.C. § 2461(c), subjects this same property to criminal forfeiture.

58. Under 18 U.S.C. § 984, a court may order the forfeiture of funds in a bank account into which monies subject to forfeiture have been deposited, without the need to trace the funds currently in the account to the specific deposits that are subject to forfeiture, up to the amount of the funds subject to forfeiture that have been deposited into the account within the past one-year period.

59. Section 984 (a) provides in part:

> (1) In any forfeiture action in rem in which the subject property is cash [or] funds deposited in an account in a financial institution
>
> > (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

9

     (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

     (2) Except as provided in subsection (c), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

  60.  18 U.S.C. § 984(b) provides: "No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense."

  61.  Thus, under Section 984, a court may order the civil forfeiture of monies found in a bank account into which deposits of criminal proceeds subject to forfeiture had been made, up to the amount of the forfeitable deposits that have been made into the account within the prior one-year period, without the need for tracing the funds to be forfeited to any of the specific forfeitable deposits.

  62.  Property subject to forfeiture is subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b)(2) and seizure via a criminal seizure warrant under 18 U.S.C. § 982(b) and 21 U.S.C. § 853(f).

## Insufficiency of Restraining Order

  63.  I submit that a restraining order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the funds for forfeiture because I have been advised of cases in which, even after restraining order or similar process has been issued to financial institution, the funds sought to be restrained were not effectively restrained by the financial institution. In my judgment, the requested seizure warrant would be the most effective way to assure the availability of the money sought to seized for forfeiture.

## Conclusion

  64.  Based on the facts and circumstances set forth in this affidavit, I submit that there exists probable cause to believe that up to $371,077.57 in funds on deposit in U.S. Bank account ending in #6229 are:

    a.  Funds traceable to, and are therefore proceeds of, a wire fraud offense or offenses, committed in violation of 18 U.S.C. § 1343;

    b.  Subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(C) and 984, including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1);

    c.  Subject to criminal forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); and

d. Subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b)(2) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

###